UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  )<br>)<br>*Plaintiff*,  )<br>)<br>*vs.*  )<br>)<br>VEROS PARTNERS, INC., MATTHEW D. HAAB,  )<br>JEFFERY RISINGER, VEROS FARM LOAN HOLD-  )<br>INGS LLC, TOBIN SENEFELD, FARMGROWCAP  )<br>LLC, PINCAP LLC, and PIN FINANCIAL LLC,  )<br>)<br>*Defendants*.  ) | No. 1:15-cv-00659-JMS-MJD |

## **ORDER**

Presently pending before the Court is Defendant Veros Partners, Inc.'s ("Veros") Motion to Modify Preliminary Injunction. [Filing No. 91.] The Court held a hearing on the motion on September 3, 2015, and a telephonic conference on October 2, 2015. In addition to information gleaned during the hearing and conference, the Court has considered the parties' briefs, as well as briefs filed by MainSource Bank ("MainSource"), an interested non-party that has not sought to formally intervene in this matter.

## I.
### BACKGROUND

**A.  The Lawsuit**

Veros is an SEC-registered investment advisory firm located in Indianapolis, Indiana. The Securities and Exchange Commission ("SEC") initiated this lawsuit related to offerings for farm loan investments made in 2013 by Veros Farm Loan Holding LLC ("VFLH") to Veros investment clients (the "2013 Offering") and in 2014 by FarmGrowCap LLC ("FarmGrowCap") to Veros investment clients (the "2014 Offering"). The SEC named as Defendants Veros, Matthew Haab

(President of Veros), Jeffery Risinger (an attorney who allegedly worked with Mr. Haab to structure and manage the private farm loan investments), VFLH, FarmGrowCap, PinCap LLC ("PinCap") (the issuer of securities in one of the offerings that is the subject of the lawsuit), Pin Financial LLC ("Pin Financial") (a Relief Defendant which acted as placement agent for private offerings made to Veros advisory clients), and Tobin Senefeld (the Chief Executive Officer of Pin Financial LLC).

> The SEC describes the crux of its lawsuit in the following way:
>
> The investors in the 2013 and 2014 Offerings were informed, orally and in writing by Haab, and in the written offering documents, that investor funds would be used to make short-term operating loans to farmers for the 2013 and 2014 growing seasons. Contrary to these representations, although some investor money was loaned to the farms, significant portions of the loan proceeds were not used for current farming operations but were used to cover the farms' prior, unpaid debt. In addition, Haab, Risinger, and Senefeld used money from the 2013 and 2014 Offerings to make approximately $7 million in payments to investors in other offerings and to pay themselves over $800,000 in undisclosed "success" and "interest rate spread" fees. They also repeatedly misled investors about the risks, nature, and performance of the investments and underlying farm loans.
>
> \* \* \*
>
> To date, less than $5 million of the approximately $12 million in loans owed in connection with the 2014 Offering have been repaid. All but one of the loans in the 2014 Offering are past due and, according to the Defendants, the loans, most of which included unpaid balances from prior years, will not be repaid in the near future. In addition, the approximately $7 million still owed on those loans ($3 million of which is the subject of a recently filed collection action) is not sufficient to repay the 2014 investors, who are owed a total of approximately $9 million in principal and interest, and are due to be repaid on April 30, 2015.

[Filing No. 57 at 2-3.]

### B. The Temporary Restraining Order and Preliminary Injunction

On April 23, 2015, the Court entered a Temporary Restraining Order which, among other things, froze certain of Defendants' assets. [Filing No. 12.] Shortly thereafter, the Court entered the parties' Agreed Order appointing William Wendling, Jr. as the Receiver for the following: (1)

VFLH's assets; (2) FarmGrowCap's assets; (3) PinCap's assets; and (4) "[a]ll private offerings in which [Veros] controls investor funds…." [Filing No. 34 at 2.]

On May 7, 2015, after entering a temporary restraining order, the Court entered a Preliminary Injunction which, in relevant part for the pending motion, provided:

> III.A.  Defendants and each of their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise…shall hold and retain funds and other assets of defendants and presently held by them, for their direct or indirect benefit, under their direct or indirect control or over which they exercise actual or apparent investment or other authority (including assets held in the name of or for the benefit of defendants), in whatever form such assets may presently exist and wherever located, and shall prevent any withdrawal, sale, payment…, transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds or other assets, which are hereby frozen, including, but not limited to, such funds held in [certain] accounts….

[Filing No. 48 at 5.]

### C. The Motion to Modify Preliminary Injunction

On July 31, 2015, Veros filed the pending Motion to Modify Preliminary Injunction. [Filing No. 91.]  Veros seeks to enter into two asset sale transactions – one with Trueblaze, LLC ("Trueblaze") and one with MW Banks Consulting, LLC ("MW Banks") – that it contends are outside the ordinary course of its business, and that it argues will operate to reduce a secured debt it owes to MainSource.  Specifically, the Court summarizes the two transactions as follows:

> **Trueblaze Offer:**  $215,000 for: (a) rights to provide business planning and strategy consulting, accounting and finance, individual tax services, business tax planning and compliance, bookkeeping and bill pay services, and start up planning services to certain Veros consulting clients, including all files and records of those clients; (b) the goodwill of Veros' business consulting and accounting business, and Veros Dental's proprietary systems, tools, and trademarks, URL, telephone number, and internal operational manuals, administrative tools, forms, processes and systems and the perpetual right to use each of them; (c) certain office equipment, furniture and fixtures, and computer hardware and software; (d) all rights of Veros under the restrictive covenant agreements entered into between Veros and Veros employees listed on a schedule; and (e) office supplies of Veros used in the business.

> **MW Banks Offer:** $90,000 for: (a) Veros' client relationships with certain consulting clients and prospective clients, and all documents and information related to those clients; (b) certain office equipment and office supplies; (c) a prepaid Indianapolis District Central Society golf outing sponsorship; and (d) Veros' relationship and position in the dental South Side Study Club.

[Filing No. 91 at 2-3.]

The transactions contemplate payment of the proceeds directly to MainSource, in partial payment of the total $620,000 loan amounts Veros owes MainSource through a term loan and a fully funded line of credit. Veros has been making monthly payments to MainSource of $7,400, and is due to make a balloon payment of $604,500 on November 18, 2015. In exchange for the transaction proceeds, MainSource has agreed to a partial release of its security interest. Other points of interest regarding the two transactions and the current state of affairs include that:

- Adam Decker is the owner of Trueblaze, but also the Vice President of Veros with a significant ownership in the company. In fact, Mr. Decker – along with Mr. Haab – provided a personal guarantee in connection with the MainSource loans, so payment of the transactions' proceeds would reduce by approximately half the amount Mr. Decker and Mr. Haab may need to pay MainSource if Veros cannot.

- MW Banks is owned and operated by Amber Banks, Mylene Egenolf, and Wendy Day York, who are all former employees of Veros.

- Ms. Banks, Ms. Egenolf, and Ms. York all signed non-compete agreements while Veros employees, and MW Banks has offered to pay Veros $5,000 total – or $1,666 each – in exchange for Veros to release them from those agreements.

- MW Banks has already started providing services to former Veros clients, and has received payments from those clients. MW Banks has not forwarded those payments to Veros nor shared them in any way.

- The agreements governing the two transactions require the approval of the SEC, the Receiver, and MainSource.

## II.
### STANDARD OF REVIEW

Veros does not set forth the legal basis for requesting modification of the Preliminary Injunction. Several district courts have noted that the inquiry into whether an injunction should be modified is governed by Fed. R. Civ. P. 60(b)(5), which "permits a party to obtain relief from a judgment or order if, among other things, 'applying [the judgment or order] prospectively is no longer equitable.'" *Reed v. Minott*, 2014 WL 5798618, *2 (S.D. Ind. 2014) (quoting and citing *Horne v. Flores*, 557 U.S. 433, 447, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009)). A request for modification of a preliminary injunction is based on "a significant change either in factual conditions or in law" such that continued enforcement of the preliminary injunction would be "detrimental to the public interest." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992). The party seeking modification has the burden of establishing that relief is warranted due to changed circumstances. *Reed*, 2014 WL 5798618 at *2.

The Seventh Circuit Court of Appeals recently stated in connection with a liquidator's request that a preliminary injunction be modified to allow distribution of certain assets the following:

> The Liquidators tell us that a court should grant a motion to modify a preliminary injunction when the movant "has demonstrated that changed circumstances make the continuation of the injunction inequitable."…It is not clear to us that this is the right standard. It parallels Fed. R. Civ. P. 60(b)(5), which says that a district judge may modify a judgment when "applying it prospectively is no longer equitable."….Yet Rule 60(b) as a whole governs requests to modify final decisions. The district court has not made a final decision in this litigation. On the way to final decisions, district judges usually may modify their tentative views. Certainly when crafting a final injunction, a district judge is not stuck with the preliminary order in the absence of a finding that it is "inequitable"; the judge is not constrained at all by the preliminary disposition when selecting the final remedy.
>
> At the same time, the fact that a final injunction lies ahead reduces the cost of sticking with the preliminary injunction. Preliminary relief will be superseded by the final decision. Instead of devoting resources to refining an interim order, a district

> judge is entitled to spend available time figuring out whether permanent relief is justified and, if so, what its terms should be. Fiddling with a preliminary injunction's terms may do damage if it postpones the final decision. We do not doubt, however, that a district judge has discretion to revise a preliminary remedy if persuaded that change had benefits for the parties and the public interest.

*Commodity Futures Trading Com'n v. Battoo*, 790 F.3d 748, 750-51 (7th Cir. 2015).

In the context of releasing frozen assets, the Court will consider whether such a release is in the best interest of the defrauded investors. *See S.E.C. v. McGinn, Smith & Co., Inc.*, 2014 WL 675611, *3-4 (N.D. N.Y. 2014) (in determining whether asset freeze should be modified, court must consider whether modification would be "in the best interests of the defrauded investors"); *see also S.E.C. v. Forte*, 598 F.Supp.2d 689, 692 (E.D. Pa. 2009) ("Several courts have held that before they will unfreeze assets, the defendant must 'establish that [the] modification is in the interest of the defrauded investors'"); *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) (in considering whether to modify asset freeze, court should look at "the disadvantages and possible deleterious effect of a freeze" versus "the considerations indicating the need for such relief").

### III.
### DISCUSSION

At the outset, the Court notes that it inquired into the fair market value of the assets to be sold in the Trueblaze and MW Banks transactions at the September 3, 2015 hearing, and ordered the Receiver to provide a Valuation Report. The Receiver requested that Blue & Co. review financial information provided by the parties to determine whether the prices offered in the Trueblaze and MW Banks transactions represented the fair market value of the assets to be sold, and then filed a Valuation Report with the Court. In the Valuation Report, the Receiver expressed his opinion that $315,000 is an appropriate value for the assets to be sold. Accordingly, based on the

Receiver's opinion, Court finds that the purchase prices outlined in the two transactions represent the fair market value of the assets to be sold.

The Court also credits testimony at the September 3, 2015 hearing to the effect that the assets to be sold are wasting assets, due to the very real likelihood that many of the clients making up the book of business to be sold have threatened to leave Veros and take their business elsewhere. This sense of urgency, along with the Court's finding that the transactions reflect the fair market value of the assets, leads the Court to conclude that the transactions are in the best interest of Veros investors, and that the Preliminary Injunction should be modified to exclude the assets that are the subject of the Trueblaze and MW Banks transactions so that those transactions can go forward.

The remaining issue the pending motion presents is whether MainSource – a non-party to this litigation – is entitled to the sale proceeds now.[1] MainSource bases its claim on the fact that

---

[1] Although Veros, the moving party, did not make this argument, MainSource argues that the assets that are at issue in the Trueblaze and MW Banks transactions are not controlled by the Receiver, and that the Court "did not appear to intend to take exclusive jurisdiction and possession of all of Veros' assets, but rather as requested by the SEC only investor funds and investor assets." [Filing No. 94 at 5-6.] The Court's actions in imposing an asset freeze and in appointing a Receiver, while related, are distinct. The purpose of an asset freeze, accomplished through the Preliminary Injunction here, is "to preserve the status quo by preventing dissipation and diversion of assets." *U.S. S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000); 15 U.S.C. § 78u(d)(5) ("In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors"). As a separate matter, the Court appointed the Receiver to "marshal[] and preserv[e] all of the assets of [VFLH, FarmGrowCap, PinCap], and all of the private offerings in which [Veros] controls investor funds," as well as certain assets of Pin Financial. [Filing No. 34 at 1-2.] The fact that certain assets may be frozen under the Preliminary Injunction, but may not be included in the definition of "Receivership Assets" in the Court's Order appointing the Receiver is of no consequence. The two groups of assets need not completely overlap, and the Court is well within its power to freeze assets additional to those that the Receiver is tasked with preserving. *See S.E.C v. Lauer*, 445 F.Supp.2d 1362, 1370 (S.D. Fla. 2006) ("there is no requirement that frozen assets be traceable to the fraudulent activity underlying a lawsuit") (quotations and citations omitted); *S.E.C v. Grossman*, 887 F.Supp. 649, 661 (S.D. N.Y. 1995) ("[i]t is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity").

it has a first priority secured interest in the assets to be sold. It is only willing to give up its lien on those assets if it gets the sale proceeds right away, as opposed to at the end of this litigation. The Court has carefully reviewed all of the briefs related to the pending motion, and finds that the SEC has raised enough questions that the Court cannot decide at this stage of the litigation, as a matter of law, that MainSource is entitled to the sale proceeds now. MainSource makes much out of its offer to give up its first priority security interest in the assets being sold in exchange for receiving the money now, but in reality MainSource is not giving up anything. Of course if it gets the sale proceeds, it would give up its security interest – especially since it has not argued along the way that the transactions do not represent the fair market value of those assets.

To be clear, the Court is not ordering that the transactions go forward – that is an issue for the parties to the transactions, the SEC, and MainSource to decide. Unfreezing the assets that are the subject of the transactions is the only course of action the Court can discern that will protect Veros' investors and potentially allow recovery of some money for assets that appear to quickly be diminishing in value. It may very well be that MainSource is entitled to the sale proceeds under applicable law, but the Court cannot reach that conclusion on the record before it at this stage of the litigation. Instead, while the Court approves the transactions and finds that the Preliminary Injunction should be modified to allow the assets to be sold, it also orders that the proceeds from the transactions – should the transactions go forward – be paid to the Clerk of the Court, to be held in escrow for distribution at a later date.

The Court notes, however, that MainSource is not giving up its first priority security interest in the proceeds of the assets being sold, and this Order has no effect on MainSource's ability to attempt to enforce that interest when those assets are disbursed. This Order also has no effect

on MainSource's ability to decline to approve the transactions, or to attempt to block the transactions if it determines it can legally do so. Those are issues for this Court, or perhaps another court, to consider another day. MainSource can decide for itself whether it wants to be first in line potentially for some amount of money, or for nothing at all.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part Veros' Motion to Modify Preliminary Injunction, [Filing No. 91], to the extent that it modifies the Preliminary Injunction so that the assets that are the subject of the Trueblaze and MW Banks transactions are excluded from the asset freeze only for the purpose of selling those assets as outlined in the Trueblaze and MW Banks transactions, but the Court **DENIES** in part Veros' Motion to Modify Preliminary Injunction, [Filing No. 91], to the extent that should the transactions take place, the Court **ORDERS** that the proceeds from the transactions be deposited with the Clerk of Court, to be placed in a segregated, interest-bearing account referencing this case. The Court further **ORDERS** that if the transactions are completed, MainSource shall be entitled to enforce its security interest in the proceeds of the assets sold to the same extent it would be entitled to enforce its interest in the actual assets, when the sale proceeds are distributed, along with other assets, at a future date.

Date: <u>October 5, 2015</u>

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**