UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>      *Plaintiff*,<br><br>    vs.<br><br>VEROS FARM LOAN HOLDING LLC, TOBIN J. SENEFELD, FARMGROWCAP LLC, PINCAP LLC, and PIN FINANCIAL LLC,<br><br>      *Defendants*. | No. 1:15-cv-00659-JMS-MJD |

## **ORDER**

In April 2015, the United States Securities and Exchange Commission ("SEC") initiated this action against Veros Partners, Inc. ("Veros"), an SEC-registered investment advisor located in Indianapolis, Indiana, three individuals who performed work by or on behalf of Veros, and several entities that issued securities through Veros. On May 1, 2015, the Court entered an Order appointing William Wendling, Jr. to serve as the Receiver over Defendants Veros Farm Loan Holding LLC ("VFLH"), FarmGrowCap LLC ("FarmGrowCap"), PinCap LLC ("PinCap"), and all private offerings where Veros controlled investor funds (the "Private Offerings"). [Filing No. 34.] On May 7, 2015, the Court issued a preliminary injunction enjoining further securities law violations by Defendants. [Filing No. 48.]

After collecting assets on behalf of the receivership, the Receiver filed a Motion for Authority to Make Interim Distributions to Investors of Veros Farm Loan Holding LLC and FarmGrowCap LLC, [Filing No. 259], the Court granted the motion, [Filing No. 269], and the Receiver moved forward with distribution by providing preliminary information to investors. Subsequently, a group of investors in one or more of the Private Offerings (the "Interested Investors")

filed an Amended Motion to Stay and Objection to Interim Distribution Methodology, objecting to the Receiver's distribution methodology and plan. [Filing No. 312.] A hearing was held on February 8, 2017, and the Court now rules on the motion.

# I.
## BACKGROUND

### A. The Lawsuit

The SEC initiated this action on April 22, 2015, [Filing No. 1], and filed the operative Amended Complaint on June 11, 2015, [Filing No. 57]. The SEC alleges that Veros and its President fraudulently raised at least $15 million from at least 80 investors through two separate farm loan offerings (the "2013 Offering" and the "2014 Offering"). [Filing No. 57 at 1.] The SEC alleges that investors purchased securities issued through the 2013 Offering and the 2014 Offering after being informed that their funds would be used to make short-term operating loans to farmers for the 2013 and 2014 growing seasons, but that significant portions of the loan proceeds were actually used to cover the farms' prior, unpaid debt, to pay investors in other offerings (including an offering in 2012 (the "2012 Offering")), and to pay the individual Defendants. [Filing No. 57 at 2.] As of the filing of the Amended Complaint, the SEC alleges that less than $5 million of the approximately $12 million in loans owed in connection with the 2014 Offering had been repaid, and that all but one of the loans in the 2014 Offering were past due. [Filing No. 57 at 3.] The SEC alleges that the loan defaults and impending investment shortfalls were not disclosed to investors in the offering material. [Filing No. 57 at 3.]

The SEC sets forth claims for: (1) violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5 against all Defendants; (2) violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), against all Defendants; (3) violations

of Sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(2)-(3), against all Defendants; (4) violations of Sections 206(1) and (2) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1) and 6(2), against Defendants Matthew Haab and Veros; (5) violations of Sections 206(4) of the Investment Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, against Veros; and (6) unjust enrichment against Relief Defendant Pin Financial LLC. [Filing No. 57 at 26-30.]

The SEC reached settlements with Mr. Haab, Mr. Risinger, and Veros. Trial against the remaining Defendants is set for April 10, 2017.

### B. Amounts Invested, Paid, and Owed

At the February 8, 2017 hearing, the Interested Investors, the SEC, and the Receiver clarified the amounts associated with the different Offerings, payments made on loans associated with the Offerings and the source of those payments, and the amounts still outstanding. Additionally, the Declaration of Jarit Loughmiller (an accountant at Blue & Co. LLC ("Blue")) submitted by the Receiver, and the Declaration of Craig McShane (an SEC Staff Accountant) submitted by the SEC, are particularly instructive. [*See* Filing No. 316; Filing No. 318.] To provide important context for comparing the Receiver's distribution plan to the plan proposed by the Interested Investors, the Court summarizes the information it gleaned from the February 8, 2017 hearing and the parties' submissions. The Court's discussion should not be construed as findings of fact, for use at trial, but rather as findings for purposes of evaluating the Interested Investors' motion only. The following table sets forth the Offerings and relevant amounts.[1]

---

[1] The information in this Table is taken from the Declaration of Jarit Loughmiller and the Declaration of Craig McShane. [Filing No. 316; Filing No. 318.]

| Offering | Type of Offering | Amount Invested /Loaned | Amount Paid to Investors and Source of Payment | Amount of Principal Outstanding |
|---|---|---|---|---|
| **2012 Offering** | Specifically targeted for loans to two farms: Crossroads and Kirbach | $4.8 mil. raised<br>• $3.37 mil. from 35 investors loaned to Crossroads<br>• $1.47 mil. from 24 investors loaned to Kirbach | All investors have been paid back principal and interest<br>• $2,792,563 paid from 2013 Offering<br>• Crossroads and Kirbach eventually paid most outstanding amounts | None |
| **2013 Offering** | Pooled investment | $9.664 mil. raised from 65 investors - $13.3 loaned to 8 farms (some re-loaning occurred as loans were paid off)<br>• $1.8 mil. to D&S<br>• $635,000 to Rosentreter<br>• $1.25 mil. to True Blue Berry<br>• $3.32 mil. to RJW Williams<br>• $3.875 mil. to Crossroads<br>• $1 mil. to Boyer<br>• $425,000 to Kirbach<br>• $1 mil. to Bassen | • All farms but RJW Williams (owes $1.564 mil.) and Bassen ($435,000 written off) have paid in full<br>• $1,408,816 from 2014 Offering used to pay investors | None |
| **2014 Bridge Loan** | Single loan | $5.2 mil. raised from 24 investors – loan used to bridge 2013 | $5.334 mil. (principal and interest) repaid. Payment likely came partially from farm | None |

| | | | | |
|---|---|---|---|---|
| | | and 2014 Offerings | borrowers in 2012 and 2013 Offerings | |
| **2014 Offering** | Pooled investment | $10,945,482 raised from 83 investors - $13.1 mil. loaned to 5 farms and PinCap (some re-loaning occurred as loans were paid off)<br>• $1.3 mil. to D&S<br>• $2.8 mil. to Rosentreter<br>• $200,000 to True Blue Berry<br>• $3.4 mil. to RJW Williams<br>• $1.1 mil. to Boyer<br>• $360,000 to PinCap | Only D&S has repaid in full. Rosentreter owes $1,473,000; True Blue Berry owes $262,000; RJW Williams owes $1,391,000; Boyer owes $1,168,000; PinCap owes $480,000 | $7,865,486.95 |

### C. The Receiver's Distribution Plan

After the Court appointed Mr. Wendling as the Receiver, he hired Blue, with Court approval, to "assist with, among other things the administration, analysis and ongoing monthly accounting and bookkeeping of the businesses of the Receivership Defendants; to prepare monthly reports to the investors/lenders; to assist with the review and analysis of the Receivership Defendants internal accounting records for accuracy and completeness and of the internal investor/lender records; to prepare reports and conclude on findings regarding the Receivership Estates; and to perform other ongoing business services required to maintain and operate the Receivership Estates during the pendency of this matter." [Filing No. 259 at 2-3.] The Receiver instructed Blue to

| | | | | |
|---|---|---|---|---|
| | | and 2014 Offerings | borrowers in 2012 and 2013 Offerings | |
| **2014 Offering** | Pooled investment | $10,945,482 raised from 83 investors - $13.1 mil. loaned to 5 farms and PinCap (some re-loaning occurred as loans were paid off)<br>• $1.3 mil. to D&S<br>• $2.8 mil. to Rosentreter<br>• $200,000 to True Blue Berry<br>• $3.4 mil. to RJW Williams<br>• $1.1 mil. to Boyer<br>• $360,000 to PinCap | Only D&S has repaid in full. Rosentreter owes $1,473,000; True Blue Berry owes $262,000; RJW Williams owes $1,391,000; Boyer owes $1,168,000; PinCap owes $480,000 | $7,865,486.95 |

### C. The Receiver's Distribution Plan

After the Court appointed Mr. Wendling as the Receiver, he hired Blue, with Court approval, to "assist with, among other things the administration, analysis and ongoing monthly accounting and bookkeeping of the businesses of the Receivership Defendants; to prepare monthly reports to the investors/lenders; to assist with the review and analysis of the Receivership Defendants internal accounting records for accuracy and completeness and of the internal investor/lender records; to prepare reports and conclude on findings regarding the Receivership Estates; and to perform other ongoing business services required to maintain and operate the Receivership Estates during the pendency of this matter." [Filing No. 259 at 2-3.] The Receiver instructed Blue to

"perform a forensic examination of the books and records of VFLH and FarmGrowCap as well as each individual investor account for the years 2012, 2013, and 2014." [Filing No. 259 at 3.]

The Receiver set forth a three-phase Proposed Distribution Plan (the "Receiver's Plan"), which he summarized as follows:

a. The Receiver will contact each investor individually to summarize and provide from the accounting review the:

- Amount invested in [the Private Offerings];

- Payments received; and

- Remaining amount of each investor's capital.

Investors will be requested to respond within thirty (30) days and provide any supporting documentation to outline/identify any discrepancy or dispute related to their contributions or payment received. After this period of time, any discrepancies or disputes which the Receiver cannot resolve will be reported to SEC and to the Court. (Phase I)

b. The Receiver will next contact each investor and provide them with calculation of their *pro rata* share (principal contributions less payments received) of the total invested capital, as well as the amount the Receiver proposes to distribute to them in this preliminary distribution. The Receiver will count payments to investors as a return of principal, not the payment of interest owed, and will properly account for any transfers of investor funds from VFLH to FarmGrow-Cap. Also, the Receiver will begin contacting other investors who were paid using the contributions of VFLH and FarmGrowCap investors and attempt to recover those funds. Investors will be requested to raise any objections to the calculation or amount of their proposed distribution within thirty (30) days. (Phase II)

c. After considering any objections from investors, and consulting with the SEC, the Receiver will then file an explanation of his accounting methodology and a schedule showing each of the proposed preliminary payments with the Court. The Receiver also will file or describe in its filing any unresolved investor objections, and provide a response to each of those objections, along with a request for a hearing on the Receiver's proposed preliminary distribution. The Receiver will not make any distributions without Court approval. (Phase III)

[Filing No. 259 at 4-5.] The Court approved the Receiver's Plan on September 12, 2016. [Filing No. 269.]

Essentially, the Receiver's Plan involves treating each investor equally, and attempting to pay each investor as much principal as possible by distributing their *pro rata* share of the total distribution amount. Given that the full amount of principal invested in all Offerings will not be recovered, and that later invested funds were used to pay off earlier investors, the Receiver's Plan proposes recovering interest paid to investors in connection with the 2012 Offering, the 2013 Offering, and the 2014 Bridge Loan, and applying those amounts toward repaying the 2014 Offering investors for their losses. The Receiver represents that because many of the 2014 Offering investors had previously invested in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan, it is possible to recover interest they received in connection with those previous investments by simply deducting those interest amounts from any recovery they would receive for their investment in the 2014 Offering. This can be accomplished through two types of accounting adjustments: (1) a "Roll Forward Reduction," applicable where the investor invested in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan, received interest payments related to their investment, and rolled forward some or all of their outstanding balance into the 2014 Offering. In that case, the amount of interest they received would be deducted from any amount rolled forward into the 2014 Offering; or (2) a "Claw Back Reduction," where the investor invested in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan, received interest payments related to their investment, and then invested new and separate funds in the 2014 Offering. In that case, the amount of interest they received would be deducted from the amount they invested in the 2014 Offering. [*See* Filing No. 318 at 31-34*.*] The Receiver acknowledges, however, that he would need to take some form of separate collection action to recover interest payments from individuals who only invested in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan, but not the 2014 Offering.

Of the total amounts recovered with respect to the 2014 Offering, the Receiver seeks to distribute $3,000,000. Under the Receiver's Plan, each investor who is owed principal would receive their *pro rata* share of the $3,000,000, or 47.38% of their principal amount due (since $3,000,000 is 47.38% of $6,331,209.65).[2]

### D. The Interested Investors' Motion and Proposed Distribution Plan

The Interested Investors are all investors in one or more of the Private Offerings, and many of the Interested Investors invested in more than one Offering. [Filing No. 312 at 3.] The Interested Investors set forth their own proposed distribution methodology (the "Interested Investors' Plan"), discussed below, and request that the Court stay any further implementation of the Receiver's Plan until their objection is resolved. [Filing No. 312.]

The Interested Investors' Plan differs significantly from the Receiver's Plan in that it creates different groups of investors that the Interested Investors claim are "similarly situated." The Interested Investors summarize their Plan as follows:

- Investors in the 2012 Offering "keep any payments relating thereto as those payments were made from loans that repaid in full";

- Investors in the 2013 Offering "keep any payments relating thereto except the methodology corrects for the outstanding Williams 2013 balance";

- Investors in the 2014 Offering "share equally on a pro-rata basis based on their 2014 principal investment subject to the 2013 Williams adjustment."

The Interested Investors describe their methodology for accounting for losses from unpaid loans to RJW Williams in 2013 and 2014 as follows:

> As to 2014 only investors: The Williams 2013 and Williams 2014 loans are effectively combined which results in a credit to the new [2014 Offering] Investors. This credit is the result of the pro rata distribution to all [2014 Offering] Investors of

---

[2] $6,331,209.65 is the principal amount due after all Claw Back and Roll Forward Reductions are taken. [Filing No. 318 at 38-39.]

- 8 -

previously paid interest on the Williams 2013 loan (interest paid to only the Investors that re-invested in [the 2014 Offering] as well as previously paid principal amount on the Williams Farm 2013 loan that was paid to investors. This credit will be paid to new [2014 Offering] Investors using cash currently held by the Receiver. Once the credit is paid, all [2014 Offering] Investors are equal and share in any remaining funds pro rata based on each investor[']s outstanding principal amounts owed. The applied credit amount for these investors is approximately +9%. These investors stay invested in [the 2014 Offering].

[2013 Offering] Investors were paid as if Williams Farm paid in full in 2013 when it, in fact, did not. As such, [2014 Offering] only investors are entitled to this credit.[3]

Under the Interested Investors' Plan, those who only invested in the 2014 Offering would stand to receive an average of $8,098.26 more than they would under the Receiver's Plan. [Filing No. 316 at 18.] Those that invested in both the 2013 and 2014 Offerings would receive an average of $6,289.37 less under the Interested Investors' Plan than they would under the Receiver's Plan. [Filing No. 316 at 19.] Those that participated in all Offerings would receive an average of $7,555.83 more under the Interested Investors' Plan than under the Receiver's Plan. [Filing No. 316 at 20-21.]

## II.
### DISCUSSION

In their motion, the Interested Investors identify three main problems that they see with the Receiver's Plan: (1) that it is based on incomplete and faulty assumptions, including that the amounts at issue do not relate to legitimate business activities and are funds of other investors obtained through fraud, and that allowing investors in the 2012 and 2013 Offerings to keep their interest payments would unfairly penalize investors in the 2014 Offering and legitimize a Ponzi scheme; (2) that it treats all investors equally, which is not the most equitable approach; and (3)

---

[3] The bullet points and the summary of the Interested Investors' methodology for accounting for losses from unpaid loans to RJW Williams are taken from a PowerPoint presentation the Interested Investors presented at the February 8, 2017 hearing.

- 9 -

that it has been costly to date, and will continue to be so if the Receiver pursues interest recovery collection action from investors in the earlier Offerings. [Filing No. 312 at 6-12.] The Interested Investors argue that their proposed methodology "results in a net positive total yield for the investors while applying an investment perspective and investment principles to the losses at issue. It is fair and logical, and it provides for an immediate disbursement of funds. Further 60 percent of the 2014 only investors receive a greater distribution." [Filing No. 312 at 10.] They also contend that their methodology is more efficient and expedient, and less expensive. [Filing No. 312 at 11.]

The SEC sets forth six main arguments in response to the Interested Investors' motion. First, it argues that the Interested Investors' Plan is based on the misconception that the farm loans given from the 2012 Offering were fully repaid by those farms in the fall of 2013. [Filing No. 317 at 4-5.] Second, the SEC argues that the Interested Investors' Plan is based on the misconception that all nine loans in the 2013 Offering were fully repaid by the nine borrowers that received loans. [Filing No. 317 at 5.] Third, the SEC asserts that the Interested Investors' Plan is flawed because it is based on information and records from Defendant Matthew Haab which is "tainted and based on inaccurate assumptions." [Filing No. 317 at 5.] Fourth, the SEC contends that the Interested Investors do not advise the Court of what percentage of the $3,000,000 interim distribution each investor or category of investors will receive, so it is impossible for the Court to determine whether their proposal is *pro rata*, fair, and reasonable. [Filing No. 317 at 5.] Fifth, the SEC argues that based on the Interested Investors' motion and a review of their proposed calculations, the investors are not treated equally with respect to the distribution of the $3,000,000 – specifically, that those who invested only in the 2014 Offering and those who invested in that Offering and the 2013 Offering are treated differently because the 2014 Offering investors receive an up-front payment, while those that invested in the other two Offerings do not. [Filing No. 317 at 5-6; Filing No. 317

at 13-14.] Finally, the SEC argues that the Interested Investors' Plan is much more cumbersome than the Receiver's Plan, and involves thirteen steps that must be completed for each investor. [Filing No. 317 at 16.]

In response to the Interested Investors' motion, and like the SEC, the Receiver notes that the Interested Investors' Plan does not treat all investors equally, and also states that the Receiver "has been contacted by a number of farm loan investors that do not agree with the proposed plan," and that "at least two farm loan investors told the Receiver that they wanted to remain anonymous, but wanted the Receiver to know that they felt they were being unduly pressured into agreeing to the [Interested Investors' Plan]." [Filing No. 319 at 5.] The Receiver argues that an element of interest recovery is common where there has been a Ponzi scheme as has been alleged here. [Filing No. 319 at 5.] The Receiver notes that Blue determined through forensic accounting that 2013 Offering investor money was used to pay the 2012 Offering investors, and 2014 Offering investor money was used to pay the 2013 Offering investors. [Filing No. 319 at 6.] The Receiver argues that the interest recovery component does not make the distribution methodology complex or administratively burdensome because "[a]s opposed to a traditional claw back, in which the Receiver would need to potentially engage in litigation to recover false profits, the Receiver can collect these unique 'claw backs' through a series of accounting adjustments labeled 'Roll Forward Reductions' and 'Claw Back Reductions.'" [Filing No. 319 at 7-8.] The Receiver notes that a significant number of the 2012 Offering and 2013 Offering investors invested their false profits into the next year, so their false profits can be recovered through a Roll Forward Reduction. [Filing No. 319 at 8.] The Receiver argues that Blue has already calculated the Roll Forward Reduction amounts, so the Interested Investors' argument that this process will be expensive is meritless. [Filing No. 319 at 8.]

The Interested Investors reply by admitting that their Plan treats investors differently, but argue that they "propose a distribution methodology which results in a fair and equitable return to the investors based upon actual investment performances." [Filing No. 322 at 4.] The Interested Investors reiterate their argument that interest recovery will create delay. [Filing No. 322 at 5.] They also argue that their methodology corrects for the outstanding RJW Williams 2013 loan balance, so "ensures that all 2014 Investors share equally on a pro rata basis based on their 2014 principal investment. This is just, fair and reasonable." [Filing No. 322 at 6 (emphasis omitted).] The Interested Investors state that they take no position on whether this was a Ponzi scheme, but "simply account for the reality that monies were eventually recovered from many of the farms and take what would seem an unremarkable position that the distribution should reflect this reality." [Filing No. 322 at 9.]

"District judges possess discretion to classify claims sensibly in receivership proceedings," and "like creditors of a debtor in bankruptcy, [investors] must accept the distribution that the court believes appropriate." *S.E.C. v. Enterprise Trust Co.,* 559 F.3d 649, 652 (7th Cir. 2009); *see also United States Securities and Exchange Commission v. Hyatt*, 2016 WL 2766285, *7 (N.D. Ill. 2016)* ("The court is afforded wide discretion in approving a plan for distribution of receivership funds"). In overseeing a receivership, the Court's primary responsibility is "to ensure that the proposed plan of distribution is fair and reasonable." *S.E.C. v. Wealth Management LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (citations omitted). The Court's goal is similar to that of a bankruptcy court in overseeing a liquidation: "the fair distribution of the liquidated assets." *Id.* at 333-34. Particularly where investors' assets are commingled and receivership funds are insufficient to fully repay investors, "equality is equity." *Cunningham v. Brown,* 265 U.S. 1, 13 (1924). In short, courts have "broad authority to craft remedies for violations of the federal securities laws." *S.E.C. v.*

*Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009). With these principles in mind, the Court considers the Receiver's Plan and the Interested Investors' Plan.

### A. Tracing the Money

The Interested Investors argue that because loans made through the 2012 and 2013 Offerings were, for the most part, paid off, investors in those Offerings should be entitled to keep principal and interest payments they have already received. In effect, other than potential adjustments to the 2013 Offering investors' recovery due to the Williams Farms' loans, 2012 and 2013 Offering investors are not part of the Interested Investors' Plan. In contrast, the Receiver's Plan provides for the recovery of interest paid to 2012 Offering, 2013 Offering, and 2014 Bridge Loan investors, based on the theory that those investors were actually repaid from fraudulent future Offerings and not from loan repayments.

While there may be situations where it is appropriate to treat investors differently because money can be directly traced to them, this is not one of those situations. *See S.E.C. v. Forex Asset Management LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (noting that distribution based on tracing funds is permissible, but a district court may also decide that tracing is not the most equitable method after considering "the positions of the various investors" and applying its discretion). The Interested Investors acknowledged at the February 8, 2017 hearing that 2012 and 2013 Offering investors were paid at least in part from subsequent Offerings – the 2012 Offering investors from the 2013 Offering, and the 2013 Offering investors from the 2014 Offering – but that these payments are insignificant because the loans were repaid by the farms shortly after the payments. However, the evidence does not support their position.

### 1. *Payback of the 2012 Offering Investors*

With respect to the 2012 Offering investors, the Interested Investors argued at the hearing that the time between when the investors received payment from the 2013 Offering proceeds and Crossroads and Kirbach ultimately repaid their loans was "a matter of months." But their position is directly contradicted by evidence submitted by the SEC which indicates that loan repayments, to the extent they occurred at all, occurred much later. Craig McShane, an SEC Staff Accountant, provides a detailed account of his analysis of the flow of investor funds through accounts controlled by Defendants. [[Filing No. 316 at 2](#).] He describes how 2012 Offering investors were paid with 2013 Offering funds and how portions of the Crossroads and Kirbach loans were rolled forward into the 2013 Offering. [[Filing No. 316 at 6-8](#).] Mr. McShane concludes that "[i]n reality, the loans to Kirbach and Crossroads were not paid off until February 8, 2016 and August 17, 2015 respectively. This was well after the filing of the SEC's complaint, and I understand that final payments were not made until after the Receiver began making efforts to collect on those loans. (Crossroads Farms also received a $50,000 loan payoff discount, and therefore paid less than the full amount due)." [[Filing No. 316 at 8](#).]

### 2. *Payback of the 2013 Offering Investors*

Similarly, Mr. McShane states in his Declaration that $1,408,816.42 from the 2014 Offering was used to pay investors in the 2013 Offering. [[Filing No. 316 at 9](#).] Additionally, amounts due from loans to Crossroads and Kirbach (left over from the 2012 loans) and a loan to Boyer Farms were not repaid, but were simply rolled forward into loans made from the 2014 Offering. [[Filing No. 316 at 8-9](#).]

Mr. McShane's Declaration clearly indicates that the 2012 Offering investors benefitted from the 2013 Offering, and the 2013 Offering investors benefitted from the 2014 Offering – both

investor groups were paid from funds raised in subsequent years as opposed to funds from the borrowers themselves. Contrary to the Interested Investors' view, funds used to pay the 2012 and 2013 Offering investors cannot fairly be traced directly to the farms who took out loans. Amounts were not repaid, if at all, until long after those investors had already been paid from funds invested in subsequent Offerings and, at least in part, until this lawsuit was filed and the Receiver took action. In short, the 2012 and 2013 Offering investors benefitted from later Offerings by receiving both the time value of their money and profit in the form of interest payments rather than having to wait until Crossroads and Kirbach satisfied their obligations.[4] The Court rejects the Interested Investors' argument that the 2012 and 2013 Offering investors should be treated more favorably than later investors because loans from those Offerings were eventually repaid.[5]

### B. Interest Recovery

The Interested Investors also argue that the Receiver's Plan is flawed because attempting to recover interest paid to 2012 Offering, 2013 Offering, and 2014 Bridge Loan investors would be costly. [[Filing No. 312 at 11-12](#).] They argue that the Receiver had already been paid $679,542 in fees as of the filing of their motion, and that he would incur a substantial amount of additional fees to recover a relatively small amount of interest. [[Filing No. 312 at 11](#).] But the Loughmiller

---

[4] The Court notes that even if farms that borrowed through the 2012 and 2013 Offerings had repaid their loans before – or closer in time to – repayment from later Offerings, this would not necessarily mean that a *pro rata* distribution was not equitable and fair. *See, e.g.*, *[Forex Asset Management LLC](#)*, [242 F.3d at 331](#) (noting that distribution based on tracing funds is permissible, but a district court may also decide that tracing is not the most equitable method after considering "the positions of the various investors" and applying its discretion).

[5] The Court acknowledges a difference between the 2012 Offering on the one hand, and the 2013 and 2014 Offerings on the other: the 2012 Offering investors invested in two discrete loans (to Crossroads and Kirbach), while the 2013 and 2014 Offering investors invested in a pooled arrangement where their funds were combined and later loaned to numerous farms. The Interested Investors do not make much of this difference, and the Court does not find it significant in terms of whether the 2012 Offering investors should be permitted to recover more than the later investors.

Declaration tells a different story. Specifically, Mr. Loughmiller sets forth $1,604,277.30 in interest that can be recovered either through Roll Forward or Claw Back Reductions. [Filing No. 318 at 38-39.] The Receiver has represented that Blue has already performed the calculations necessary to accomplish those accounting adjustments, and the Interested Investors have not provided evidence indicating otherwise. Therefore, no additional costs will be associated with the recovery of $1,604,277.30 in interest from 2012 Offering, 2013 Offering, and 2014 Bridge Loan investors who also invested in the 2014 Offering.

Mr. Loughmiller also sets forth $184,332.34 in interest already paid to investors for which the Receiver would need to take collection action to recover. [Filing No. 318 at 39.] These amounts are interest paid to those who only invested in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan, but not the 2014 Offering, so Roll Back or Claw Forward Reductions to 2014 Offering recoveries cannot account for those amounts. The Court shares the Interested Investors' concern that pursuing interest recovery under those circumstances may not make financial sense. However, the Court cannot conclude at this point that the Receiver should not take any action to recover those interest payments. Indeed, the Receiver advises in his Seventh Interim Report that "[a] cost benefit analysis will need to be undertaken to determine how far to pursue these collections." [Filing No. 354 at 4-5.][6] In order to account for the Court's and the Interested Investors' concerns, the Court will require the Receiver to file a Report which summarizes that cost-benefit analysis, and will require the Receiver to provide notice to the Interested Investors

---

[6] The Receiver also estimates in the Seventh Interim Report that his fees to complete the wind down of the receivership will total approximately $600,000, and that the wind down should be complete by August 2017. [Filing No. 354 at 10.]

and to obtain Court approval before pursuing recovery of interest payments that cannot be accomplished through accounting adjustments.[7]

In sum, the Court finds that treating investors similarly by recovering interest payments and distributing all recovered amounts on a *pro rata* basis based on principal invested is the most equitable approach under the circumstances present here. The Interested Investors agree that the 2012 Offering, 2013 Offering, and 2014 Bridge Loan investors were paid off with funds from subsequent Offerings. Even if the loans, or the majority of the loans, associated with the Offerings they invested in were ultimately repaid, the Court finds it most equitable that the earlier investors should not benefit from the ill-gotten gains they received in the form of both profit (interest) and the time value of their money.[8] The Court finds that recovering interest from those earlier investors and applying it toward reimbursing later investors is fair and equitable. The Court also finds that paying each investor who is still owed principal their *pro rata* share of recovered funds is the simplest and fairest way to distribute those funds.

### III.
#### CONCLUSION

Given the ongoing nature of the fraud alleged in this action, the lack of justification for treating investors differently, and the extensive forensic accounting work already performed that will allow significant interest recovery to be accomplished with no added costs, the Court **DENIES**

---

[7] The Interested Investors focus on the fees the Receiver has charged thus far, but the Court notes that the Receiver has accomplished important work for the receivership – he has recovered approximately $14.5 million, and has already distributed $5,225,026.03 of that amount to investors. [*See* Filing No. 354 at 11.]

[8] The Court notes that investors in the 2012 and 2013 Offerings and the 2014 Bridge Loan also received the full amount of their principal (rather than just a *pro rata* share), so will ultimately recover more relative to the 2014 Offering investors even if their interest is recovered.

the Interested Investors' Amended Motion to Stay and Objection to Interim Distribution Methodology. [Filing No. 312.] However, the Court acknowledges the Interested Investors' concerns with the continued accrual of costs by the Receiver, **ORDERS** the Receiver to file a Report with the Court once he has completed a cost-benefit analysis of pursuing interest recovery from investors in the 2012 Offering, the 2013 Offering, and/or the 2014 Bridge Loan that cannot be accomplished through accounting adjustments, and **ORDERS** that the Receiver seek Court approval before pursuing any such interest recovery.

Date: 2/16/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**